UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                                      Hon. Hugh B. Scott

                                                      09CR61A

                   v.                              Report
                                                      &
                                         Recommendation

**James W. Wilson,**
               **Defendant.**

Before the Court is the defendant's omnibus motion seeking various relief including the suppression of evidence and statements (Docket No. 11).[1]

## Discussion

On February 25, 2009, the Grand Jury for the Western District of New York indicted the defendant, James W. Wilson ("Wilson") on three counts: that on October 14, 2005 he stole $6,317 in the form of benefits from the United States Federal Management Agency ["FEMA"] in violation of 18 U.S.C. §§641 and 2 [Count 1]; that between October 14, 2005 and October 11, 2006, Wilson created false documents and devised a scheme to defraud FEMA of disaster and relocation assistance in violation of 18 U.S.C. §§1341 and 2 [Count 2]; and that between October

---

[1] The defendant's various requests for discovery are discussed in a separate Decision & Order.

14, 2005 and October 11, 2006, Wilson conspired with another individual to defraud FEMA by impeding, impairing, obstructing and defeating the lawful government functions in providing emergency financial assistance to individuals in violation of 18 U.S.C. §371 [Count 3]. More specifically, Wilson is charged with devising a scheme and creating false documentation, so that his then-girlfriend Valletta Simmons could file a false claim seeking emergency assistance for housing from FEMA as an alleged victim of Hurricane Rita[2].

The defendant seeks to suppress statements he made to law enforcement officers during an interview on April 10, 2008.

**Discussion**

A suppression hearing was held on July 23, 2009 and October 2, 2009. Robert Venderbles, an officer with the United States Department of Homeland Security Office of the Inspector General ("DHSOIG"), testified that the DHSOIG received a referral from a Texas law enforcement official to the effect that Simmons had filed a disaster claim with FEMA as a result of Hurricane Rita and that Simmons was residing in Buffalo, not Texas, at the time of the hurricane. (Docket No. 17 at pages 7-8). Vanderbles stated that the Texas authorities provided various documents, including United States Treasury checks, and copies of alleged rental receipts and invoices. (Docket No. 17 at page 8). Wilson's name was on several of the documents (Docket No. 17 at page 8).

On April 10, 2008, Vanderbles and DHSOIG Special Agent Richard Ford went to speak

---

[2] Hurricane Rita struck Texas and the Gulf coast in September of 2005 (Docket No. 17 at page 7.

2

with Wilson to "get a general understanding of his relationship with Valetta Simmons and to inquire about the documents that were submitted to FEMA." (Docket No. 17 at page 9).   Wilson was employed by the Buffalo Public School as a plumber. (Docket No. 18 at page 13). Vanderbles testified that they arrived at the plant services facility at approximately 8:00 a.m. and spoke with the assistant superintendent who arranged for Wilson (who was working in a different location at that time) to come to the plant services facility to meet with Vanderbles and Ford. (Docket No. 17 at pages 9-10).  Wilson arrived at approximately 9:00 a.m., and, according to Vanderbles, had a brief discussion with the agents and the assistant superintendent.  (Docket No. 17 at page 10).  Vanderbles stated that Wilson was "very calm", did not appear to be under the influence of any drugs, alcohol or disability.  Vanderbles testified that he was wearing street clothes and that his service firearm and handcuffs would not have been visible.  (Docket No. 17 at page 10-11).   The agents asked Wilson to go with them to their downtown office, and he agreed. (Docket No. 17 at page 11).  Vanderbles stated that Wilson did not appear reluctant to go and that the agents told Wilson he would be back by lunch.  (Docket No. 17 at pages 11-12).  The three men, Vanderbles, Ford and Wilson drove to the DHSOIG office at 130 South Elmwood Avenue in a in a black Ford Explorer driven by Agent Ford.. (Docket No.  17 at page 12). Wilson was not restrained during the trip. (Docket No. 17 at pages 15-16).

When the three entered the building, Vanderbles testified that he and Ford proceeded to the employee entrance and waited for Wilson, who had to wait in the visitor's line and clear security. (Docket No. 17 at page 16)[3].  The men proceeded to a conference room (approximately

---

[3]  According to Vanderbles, the employee entrance is about 30 to 40 feet from the visitor's entrance where all visitors to the building must pass through security.  Vanderbles did not assist Wilson in getting through security. (Docket No. 18 at page 33).

14' by 20' in size) in the DHSOIG office which contained one large desk and three chairs. (Docket No. 17 at page 17-19). Wilson remained calm and did not ask for an attorney. Neither Vanderbles, nor Ford, read Wilson his rights because according to Vanderbles, they did not consider him to be in custody at that time. (Docket No. 17 at page 19). Vanderbles stated that his and Ford's demeanors were friendly, that they did not raise their voices, that no threats or promises were made, and that they were not untruthful with the defendant. (Docket No. 17 at pages 20, 29). Vanderbles testified that he showed Wilson the documents relating to Simmon's claim for benefits. According to Vanderbles, Wilson stated that he assisted in the creation of the documents submitted to FEMA. (Docket No. 17 at page 21). The government introduced an invoice for alleged moving expenses from Orange, Texas to Buffalo, New York as Exhibit 6 at the suppression hearing. Vanderbles stated that Wilson's signature is on the document and that Wilson admitted that he created the document. (Docket No. 17 at pages 22-23). He stated that Wilson signed a statement regarding his relationship with Simmons and the assistance he provided Simmons with respect to her claim for benefits. (Docket No. 17 at pages 24 -26; Exhibit 7). At the end of the interview, Wilson asked "what was going to happen at this point?" and was advised that the agents would take the information to the U.S. Attorney's Office and the U.S. Attorney would make a decision "as to what happens next." (Docket No. 17 at page 27). Vanderbles stated that they returned Wilson to the plant services facility before lunchtime. (Docket No. 17 at page 28).

On cross-examination, Vanderbles acknowledged that at the time they decided to speak with Wilson they understood that he might have been an accomplice based upon their interview

with Simmons. (Docket No. 18 at page 4)[4]. Vanderbles also testified that they did not attempt to determine the location of Wilson's residence, but instead decided to visit him at his workplace. (Docket No. 18 at page 13). Wilson was not at the plant services facility when the agents arrived. Vanderbles asked the assistant superintendent to locate Wilson and ask him to report to the plant services facility to speak with the agents. Vanderbles stated that he did not know what Wilson's supervisors told him as to why he had to report to the plant services facility. (Docket No. 18 at page 17-19).[5] Vanderbles admitted that they could have interviewed Wilson in the assistant superintendent's office but chose not to, at least in part because they did not want anyone where Wilson was employed to know why they were asking Wilson questions. (Docket No. 18 at page 24, 61).[6] He could not recall whether he advised Wilson that Wilson could meet the agents at the DHSOIG office instead of driving with them. (Docket No. 18 at page 28). Although Vanderbles testified that Wilson went with the agents voluntarily, Vanderbles did not advise Wilson that Wilson was free not to accompany the agents to the DHSOIG office or that he could leave once they were at the DHSOIG office. (Docket No. 18 at pages 32, 38). Vanderbles stated that on the ride over to the DHSOIG office, the agents had casual conversation with

---

[4] Vanderbles testified that the information they received contained some information suggesting that Simmons had a drug habit and possibly worked as a prostitute. Vanderbles stated that he felt it necessary to confirm some of the information she provided. (Docket No. 18 at page 54).

[5] Vanderbles stated that they told the assistant superintendent that they wanted to speak with Wilson about an investigation but did not state the specifics of their investigation. (Docket No. 18 at page 59).

[6] The defendant suggests that this could have been accomplished at the plant services facility if they just stayed in the assistant superintendent's office with the door closed. (Docket No. 18 at page 61).

Wilson and that Wilson advised the agents that he had once been shot in the head by his niece's boyfriend. (Docket No. 18 at page 35). The door of the conference room was shut during the interview with Wilson. (Docket No. 18 at page 50). According to Vanderbles, he and Ford sat on the side of the table with their backs to the wall; Wilson sat across the table with his back to the door. (Docket No. 18 at page 50). Vanderbles stated that they asked Wilson about his relationship with Simmons but did not stated that he was a person of suspicion or that they considered him an accomplice. (Docket No. 18 at page 36). According to Vanderbles, at the time of the interview Wilson was free to leave. (Docket No. 18 at page 51).

Although he did not testify at the suppression hearing, Wilson submitted an affidavit which states that one of the agents "showed me his weapon and indicated that I should not make any unnecessary movements." (Docket No. 14 at ¶ 9). The defendant states that he believed that he was not free to leave. (Docket No. 14 at ¶ 13). The defendant argues that any statements he made during the interview on April 10, 2008 should be suppressed because he was never read his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966).

The Fifth Amendment to the United States Constitution provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. In that context, pursuant to Miranda, "a person questioned by law enforcement officers after being taken into custody or otherwise deprived of his freedom of action in any significant way must first be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Stansbury v. California, 511 U.S. 318, 322 (1994) (internal quotation marks omitted). The Second Circuit has explained:

> The test for custody is an objective one: "whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." United States v. Ali, 68 F.3d 1468, 1472 (2d Cir.1995) (internal quotation marks omitted).

In that regard, a defendant's subjective belief that he was not free to leave is irrelevant; rather, the question is what a reasonable person would have believed. United States v. Kirsteins, 906 F.2d 919, 923 (2d Cir.1990). An officer is not required to administer Miranda warnings to every person they question, even if that questioning takes place at the police station. Stansbury, 511 U.S. at 325 (even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue); Oregon v. Mathiason, 429 U.S. 492, 495 (1977)(finding defendant not in Miranda custody even though police presented him with false evidence of his guilt during questioning at the police station); Beckwith v. United States, 425 U.S. 341, 347 (1976) (being the focus of a criminal investigation is not sufficient to render one in Miranda custody); Cruz v. Miller, 255 F.3d 77, 81-82 (2d Cir.2001) ( Miranda warnings not required simply because the questioning takes place in a coercive environment such as a police station); United States v. Cota, 953 F.2d 753, 756-59 (2d Cir.1992) (suspect not in Miranda custody even though she was initially removed from her car at gunpoint and placed in handcuffs, which were eventually removed, before acceding to a police officer's request for a station house interview).

The test calls for a "contextual approach," Michigan v. Chesternut, 486 U.S. 567, 573, (1988), that takes into account "all the circumstances surrounding the incident ... in each individual case." Chesternut, 486 U.S. at 572 (internal quotes omitted). It is also an "objective standard-looking to the reasonable man's interpretation of the conduct in question." Chesternut,

486 U.S. at 574. There is no requirement that an officer affirmatively advise an interviewee that he is free to leave or terminate the interview. U.S. v. Hooper, 935 F.2d 484, 492 (2d Cir. 1991); U.S. v. Montilla, 928 F.2d 583, 589 (2d Cir. 1991).

Based upon the record in this case, considering all the facts and circumstances surrounding the interview of Wilson on April 10, 2008, a reasonable person would not have concluded that he was not free to leave. The record does not reflect any show of force on the part of Vanderbles or Ford. The defendant's statement that he was shown a weapon is inconsistent with the record as a whole, and does not appear to be credible. Although he was not advised of his right not to accompany the officers or that he was free to leave, the record does not reflect any basis to conclude other than that Wilson was voluntarily cooperating with the agents on April 10, 2008. It is undisputed that Wilson was not told that he was under arrest; he was not handcuffed at any time; he was not frisked for weapons or contraband; he was not escorted in the visitor's line at 130 South Elmwood, but left to go through the security check on his own just as any visitor to the building; he was seated in the conference room, closest to the door with no one between him and the door; the interview lasted only approximately 90 minutes; he was told he would be driven back to work before lunch – and he was. There is no basis to conclude that the officers made affirmative indications that Wilson was not free to leave at the time of the interview. The defendant's reliance on U.S. v. Valentine, 657 F.Supp.2d 388 (W.D.N.Y.,2009) is not persuasive. In Valentine, the defendant was driving in a car which was pulled over by the police; he was informed that the police were investigating a stabbing that had occurred in a bar which the defendant had just exited; he was told to get out of the car; he was frisked, and then directed to take seat in back of squad car. The Court found that under those circumstances he

was in custody for Miranda purposes, regardless of fact that he was not handcuffed or physically forced into the squad car because the average person in the defendant's shoes would not reasonably have believed that he could refuse and go on his way. Valentine, 657 F.Supp.2d. at 391. Contrary to the coercive facts of Valentine, the facts and circumstances in the instant case reflect that Wilson voluntarily cooperated with the agents on April 10, 2008.

Similarly, the fact that the agents approached Wilson at his place of employment does not render the encounter coercive. Unlike the facts in Garrity v. New Jersey, 385 U.S. 495 (1967), there is no evidence in the instant case that Wilson faced job loss or any economic sanction if he decided not to talk to the agents. The mere risk of any adverse economic consequence, no matter how slight or insubstantial, does not automatically render a statement involuntary. United States v. Montanye, 500 F.2d 411, 415 (2d Cir.), cert. denied, 419 U.S. 1027 (1974). Instead, "a statement challenged on the ground that it was obtained as the result of economic sanctions must be rejected as involuntary only where the pressure reasonably appears to have been of sufficiently appreciable size and substance to deprive the accused of his 'free choice to admit, to deny, or to refuse to answer." Montanye, 500 F.2d. at 415; see also. U.S. v. Puntigam, 1997 WL 811528 (S.D.N.Y. 1997). No evidence of such pressure is present in this case. The fact that the agents approached Wilson at his place of employment, or that Wilson agreed to accompany them to the DHSOIG office in their car, does not, without more, transform the interview into a custodial event. Inculpatory statements are not involuntary "when they result from a desire to cooperate, or from a defendant's ignorance of, or inattention to, his right to remain silent." United States v. Mitchell, 966 F.2d 92, 100 (2d Cir.1992). The defendant has failed to demonstrate the existence of any factual basis to conclude that the agents made any affirmative indication that he was not

9

free to leave or to not answer their questions.

## Conclusion

Based on the above, the it is recommended that the defendant's motion to suppress his statements made on April 10, 2008 be denied.

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen(14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as WDNY Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to

consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See <u>Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District Court's refusal to consider the objection.**

So Ordered.

*/s/ Hugh B. Scott*
United States Magistrate Judge
Western District of New York

Buffalo, New York
March 8, 2010